UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

CHARLES HARRIS                          CIVIL ACTION NO. 12-cv-1846

VERSUS                                  JUDGE FOOTE

JERRY GOODWIN                           MAGISTRATE JUDGE HORNSBY

## REPORT AND RECOMMENDATION

### Introduction

A Bienville Parish jury convicted Charles Harris ("Petitioner") of the attempted second-degree murder of Lorenzo Stafford after Petitioner shot Stafford in the back with a 12-gauge shotgun. The conviction and a 15-year sentence were affirmed on direct appeal. State v. Harris, 22 So.3d 232 (La. App. 2d Cir. 2009), writ denied, 36 So.3d 227 (La. 2010). Petitioner also pursued a post-conviction application in the state courts. He now seeks federal habeas corpus relief on several grounds. For the reasons that follow, it is recommended that his petition be denied.

### Facts

Nerita Loud and Kendrick Brown lived in a trailer near Ringgold on property that was apparently owned in part by Petitioner. Petitioner came to their door one day to talk about moving some boards off the property. He then left, but Ms. Loud could see through her window Petitioner and Lorenzo Stafford, both of whom she knew, talking nearby. She was on the phone with her sister, Darnell Arrington, when she said that it looked as if the two

men were about to fight.  Ms. Arrington testified that she then heard over the phone what sounded like a gunshot.  She quickly drove to her sister's home, and saw Ms. Loud and Mr. Brown running out the back door of the trailer.  They reported that Mr. Stafford broke into the house through the front door, and they were leaving.

Ms. Loud had handed Ms. Arrington the phone, but Mr. Stafford had apparently knocked an extension off the hook, so she could not place a call for help.  Petitioner walked up to her, fell down on one knee and asked Ms. Arrington to put water over his head.  He said, "That n***** tried to kill me."  Ms. Arrington ran about two blocks to borrow a phone and call 911.  When she returned, Petitioner had returned to his car a short distance away.

Police arrived and first talked to Petitioner, who told them that Stafford had beat him on the back with a shotgun.  One of the officers saw blood inside Petitioner's car.  About that time, Ms. Arrington yelled that Mr. Stafford was inside the trailer and had been shot.  An officer saw a large hole in Stafford's right lower back, and there was blood all over the floor.  Two ambulances were called.

An officer asked Mr. Stafford what happened, and he said that Petitioner shot him with a shotgun that had been sawed off at the barrel and the stock.  An officer asked Petitioner if he shot Stafford, and Petitioner said yes.  When asked why, he said that it was because Petitioner owed Mr. Stafford some money, Stafford had beat him over the back with a shotgun, and he thought Stafford was going to kill him.  Police searched for the shotgun but were not able to locate it until the next day when it was found on the roof of a nearby shed.  The pump action shotgun was in terrible condition and bent so that the action would

not cycle.  No fingerprints could be recovered from it, and a check of ATF records could not determine its ownership past a man from another town who bought it many years earlier.

Dr. Cuthbert Simpkins testified that he treated Mr. Stafford at the LSU Medical Center.  When the patient arrived, his vital signs were unstable, and he was rushed to the operating room.  Stafford suffered from what appeared to be a close-range shotgun blast that placed a large number of pellets in his body in the flank area.  Physicians had to remove his spleen and repair his diaphragm.  A kidney was also injured, but physicians elected to observe it rather than operate.  Dr. Simpkins said there was "no question" that it was a life threatening injury, and he was originally concerned that Stafford would be paralyzed.  Mr. Stafford left the hospital without the full use of his legs, using a walker, but was able to make a good recovery in time.

An officer attempted to interview Petitioner at the hospital where he was treated.  An ER nurse said that Petitioner was alert and very responsive.  But when the officer entered the room, Petitioner would not make eye contact with him, arched his back and grimaced his face as if in severe pain, and the officer could not get a statement from him.

Mr. Stafford testified that he was a former school teacher, had a used car lot, and did some auto repair.  He had known Petitioner for many years but had not seen him in several months when Petitioner called and asked to borrow $200.  Stafford agreed to make the loan.  When Petitioner came for the money, he asked for another $50, which Stafford also loaned.  Petitioner said he would repay the $250 on Friday, the next day.  Petitioner instead called

Stafford and offered to sell him a piece of land at a good price, $3,000, because Stafford had done him a favor.

Petitioner came to Stafford's house that Saturday.  Stafford said he was not armed and was wearing shorts and a T-shirt when he got in Petitioner's car with him to go visit the property.  When they arrived, Petitioner first spoke to the tenants in the trailer about removing some lumber.  Stafford waited by the car.  When Petitioner returned, he took a sawed-off shotgun from the trunk and said, "Do you mind if I shoot this?"  Stafford said he replied, "Your property," after which Petitioner then suggested that Stafford "bust off the first round."  Stafford said he replied that he did not want to shoot the gun, and Petitioner replied, "Well, let's go ahead and head on back."  Petitioner noted that Stafford had been impressed by the smooth ride of the car and suggested Stafford drive back.  Stafford said this made him a little uncomfortable, but he agreed and began walking toward the driver's door.  As he reached the door, Petitioner shot him in the back.

Stafford said he hit the ground, rolled over, and asked, "What's going on?"  Petitioner said, "You fixing to die."  Petitioner tried to reload the shotgun, and Stafford pulled out his cell phone and tried to take a photo and call 911.  Petitioner tried to grab the phone, and the men began to struggle, with each of them having their hands on the gun.  Stafford eventually fell in the seat of the car, got it started, and attempted to leave.  Petitioner was able to enter the car, turn off the key, and put it back in park.  Stafford began hitting Petitioner in the head, and the two men started biting each other.  At one point Petitioner backed away from the car.  When he advanced on Stafford, Stafford kicked the door into Petitioner and knocked him

Page 4 of  32

down.  Stafford then ran to the trailer, knocked down the door, went inside and placed a chair behind the door.  He looked for a phone but collapsed, exhausted, on a couch.  After a rest, he crawled to the door and saw a police officer and Ms. Arrington.  Stafford said he never hit Petitioner in the back with the gun.  He also said the men never argued or fought at all, either that day or before.

Petitioner did not testify at trial, but a recorded statement that he gave police about two weeks after the incident was played for the jury.  Petitioner told police that the matter began when he borrowed $4,500 from Mr. Stafford in March, several months before the September shooting.  He said Stafford was a loan shark.  Petitioner's payback balance was supposed to be $6,000 due in the middle of August.  The $4,500 loan was delivered by two men wearing ski masks who threw the money in Petitioner's car and left.

Petitioner said that he did not have quite all the money he needed to repay the loan as the due date approached, and he called Stafford for a meeting.  He waited in a rural area for what he thought was a meeting with Stafford, but a white van arrived with approximately four masked men who held a gun on Petitioner and demanded payment.  They blindfolded Petitioner, tied him, put him in the van, and roughed him up a bit.  Petitioner said they put an oxygen-mask type device on him and "pumped something in my system" that made him unconscious.  He did not leave until the next morning, and he had to stay in bed for four or five days.  He added that the men told him that if the matter went any further the lives of his family would be in danger.  Petitioner also said he gave the men $3,000 that night. Petitioner said that he arranged to meet Stafford the next week to pay the $3,000 balance, but the

masked men in the van showed up again, roughed him up a little bit, and warned him to be more professional the next time he borrowed money.

Petitioner stated that Stafford called him later and said he needed another $1,000 from Petitioner for late charges.  Petitioner suggested that Stafford instead buy some property from him with a $1,000 credit towards the price.  He said the men discussed the property a couple of times, and Stafford insisted that Petitioner join him to review the property lines.  When Petitioner arrived, Stafford got in the car with a shotgun that he said he was going to use to "just bust it off a couple of times" while at the property.  The men were discussing the potential transaction, and the shotgun was on top of the car when Petitioner went to the trunk to get a beer.  He said Stafford then hit him hard and continued to beat him with the gun. Petitioner said he struggled and managed to grab the gun by the handle and flip it to his advantage.  Stafford then "tried to haul ass to the front of my car and I, I, I shot him in the back."  Petitioner said that he tried to eject the empty shell, but the gun hung, and he had to use his finger to remove the empty shell.

Petitioner said Stafford got in the car and tried to crank it and back over Petitioner, who was lying behind the car.  Petitioner said he was able to get up and knock the car out of gear, but Stafford was able to regain control of the gun.  Petitioner then obtained possession of the gun and "just threw it out."  He got the keys from the ignition, threw them, and then Stafford "cold cocked me slap dead in my forehead there, and I blacked out and went down and he come right out behind me and grabbed that dad-gum shotgun and started beating me with it again."  Petitioner said he knew Stafford was about to kill him and heard him trying

to "cock" the shotgun, but Stafford soon ran up the driveway to the nearby trailer and broke inside.  Petitioner said he walked up to the trailer and "peeped in to see if I saw him," but decided to return to the car where he saw three red 12-gauge shells on the driver's seat.  He said he "took them and just slung them out."

Photographs of Petitioner at the time of his arrest showed some minor bruises and a few wounds to his arms that Petitioner said were bites, but there were no visible injuries or bruises on his back.  The police did not see any beer in the car or shotgun shells on the ground in the area.  Stafford said he would never loan anyone $4,500 and did not even finance the used cars that he sold.  Petitioner admitted in his statement to police that he was not employed; he said he  and had been able to pay the $6,000 with money from his family and some that he had made from "just hauling scrap and little I had put back."  Petitioner concluded his statement by saying, "I hate it happened.  Just one of them things I guess."

Stafford said at a sentencing hearing that he believes Petitioner shot him, despite a good 20 year relationship, in an attempt to rob him of the $3,000 land purchase-price that Petitioner assumed Stafford had in his pocket.  It was not admitted at trial, but a deputy testified at a preliminary examination that a toxicology screen showed that Petitioner had cocaine in his system.

## Jury Instruction Issues

### A. The Incorrect Instruction

Louisiana defines second-degree murder to include the killing of a human being when the offender has "a specific intent to kill or to inflict great bodily harm."  La. R.S.14:30.1.

The Louisiana courts have held for decades prior to the trial in this case that a conviction for attempted second-degree murder requires proof of specific intent to kill, not merely to inflict great bodily harm.  State v. Butler, 322 So.2d 189 (La. 1975), citing State v. Roberts, 35 So.2d 216, 217 (1948).  Butler made clear that the specific intent to inflict great bodily harm is not an alternative to the intent to kill element.  Butler, 322 So.2d at 191-93; Gray v. Lynn, 6 F.3d 265, 268-69 (5th Cir. 1993).

The trial commenced with preliminary instructions from Judge Glenn Fallin that the bill of information was based on two articles of the Criminal Code, the attempt statute and the statute for second-degree murder.  The latter was said to be "the killing of a human being when the offender had specific intent to kill or inflict great bodily harm."  Tr. 641.  In opening statements, ADA Tammy Jump said that the elements of attempted second-degree murder were that the defendant had the specific intent to commit the crime of second-degree murder and did an act towards the commission.  Counsel read the statutory definition of second-degree murder and reminded the jury: "It's not necessary that you have the specific intent to kill somebody, but if you have the intent to inflict great bodily harm, that can also fall under second-degree murder."  Tr. 646-47.  She concluded her opening by saying that the jury, after hearing everything, would find that Petitioner did not act in self-defense and had the specific intent "to kill or inflict great bodily harm" upon the victim.  Tr. 656.

The prosecutor repeated this mistake during closing arguments.  She read the definitions of second-degree murder and attempt, then said, "We got to prove that he had the intent to kill or inflict great bodily harm."  She then argued that the circumstances, including

use of a shotgun at close range, indicated that Petitioner "intended to kill him or inflict great bodily harm."  Tr. 756.

Judge Fallin provided counsel written draft jury instructions to allow review and any objections.  Defense counsel Jack Wright, Jr. stated that he had no objections.  Tr. 763-64. The jury instruction included the definition of attempt and the definition of second-degree murder, which included the "great bodily harm" component.  Tr. 768-69.  The judge did not, however, squarely state that an attempt with only the intent to inflict great bodily harm would support a conviction.

### B. State Court Litigation of the Issues

Defense counsel Wright withdrew after the trial.  Attorney Dmitrc Burns enrolled and filed a motion for new trial that argued the jury instruction was clearly wrong and counsel was ineffective for not objecting to the instructions.  Tr. 315-23.  The court held argument on the issues.  The State agreed that the instructions were wrong but argued that it was harmless error given the close-range shooting with a shotgun.  The judge said, "You learn something new everyday, I guess," and went on to explain that he had not been familiar with the law on the issue.  He took responsibility for the incorrect instruction but found that the mistake was harmless in light of the evidence.  Tr. 790-800.

Petitioner argued on direct appeal that (1) the trial court gave an incorrect definition of attempted second-degree murder and (2) counsel was ineffective for not objecting.  The appellate court noted that the trial judge did not specifically instruct the jury that it could convict if there was specific intent to commit great bodily harm, but the instruction "had the

effect of including that element" in the definition of the crime.  The instructions were, therefore, clearly erroneous, but the court held that review was barred for lack of a contemporaneous objection to preserve the issue for appellate review.  As for ineffective assistance of counsel, the court said that matter was more properly raised in an application for post-conviction relief where there would be an opportunity for a full evidentiary hearing. State v. Harris, 22 So.3d at 238-39.

Judge Drew, joined by Chief Judge Brown, concurred to add that the jury apparently rejected Petitioner's story and agreed with the victim that Petitioner shot him in the back at close range with a sawed-off shotgun while lacking lawful provocation.  The two judges believed there was "no realistic chance" the erroneous instructions and arguments "made any difference whatsoever in the guilty verdict."  They found that any reasonable juror would conclude that Petitioner had the specific intent to kill when he pulled the trigger of the shotgun at close range and said, "You are going to die."  Thus, the verdict was surely unattributable to any trial error. Id. at 240.

Petitioner raised these two claims again in his post-conviction application.  Tr. 1010. The State filed an opposition that argued harmless error with respect to the instruction and lack of prejudice on the ineffective assistance claim.  Tr. 1250.  Three days later, the trial judge issued a three-sentence judgment that stated the court (1) had reviewed the eight claims in the application, (2) agreed with the State's arguments and denied all claims as lacking merit, and (3) ordered the clerk to provide notice to the parties.  Tr. 1287.  The state appellate court summarily stated that Petitioner "failed to meet his burden of proof that the requested

relief should be granted" so, "on the showing made, this writ is hereby denied." Tr. 1303. The Supreme Court of Louisiana denied writs without comment. Tr. 1307.

### C. Applicable Constitutional Law

A habeas petitioner bears an "especially heavy" burden when he "seeks to show constitutional error from a jury instruction that quotes a state statute." Waddington v. Sarausad, 129 S.Ct. 823, 831 (2009), citing Henderson v. Kibbe, 97 S.Ct. 1730 (1977). A mere deficiency in the instruction does not necessarily constitute a due process violation. The petitioner must show both that the instruction was ambiguous or erroneous and that there was a reasonable likelihood that the jury applied the instruction in a way that relieved the State of its burden of proving every element of the crime beyond a reasonable doubt. Waddington, 129 S.Ct. at 831-32. It is not enough that there is some slight possibility the jury misapplied the instruction. The question is whether the ailing instruction by itself so infected the entire trial that the conviction violates due process. This assessment must be made in the context of the instructions as a whole and the trial record. Id.

With respect to the claim of ineffective assistance of counsel, Petitioner must show first show that counsel's performance was deficient, which is conceded here. He must also show that had counsel performed reasonably, there is a reasonable probability that the result in the case would have been different. Strickland v. Washington, 104 S.Ct. 2052, 2064 (1984).

### D. Deference Under Section 2254(d)

Habeas corpus relief is available with respect to a claim that was adjudicated on the merits in the state court only if the adjudication (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  28 U.S.C. § 2254(d).

A state court's decision is contrary to clearly established Supreme Court precedent when it relies on legal rules that directly conflict with prior holdings of the Supreme Court or if it reaches a different conclusion than the Supreme Court on materially indistinguishable facts.  Pape v. Thaler, 645 F.3rd 281, 287 (5th Cir. 2011). A state court makes an unreasonable application of clearly established federal law when it identifies the correct governing legal principle from the Supreme Court's decisions but applies it to the facts in a way that is not only incorrect but objectively unreasonable.  Renico v. Lett, 130 S.Ct. 1855, 1862 (2010).

"Section 2254(d) applies even where there has been a summary denial."  Cullen v. Pinholster, 131 S.Ct. 1388, 1402 (2011).  A petitioner who challenges a state court's summary denial may meet his burden under the first prong of Section 2254(d) only by showing that there was "no reasonable basis" for the state court's decision.  The federal habeas court must determine what arguments or theories could have supported the summary decision, and then it must ask whether it is possible fair-minded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of the

Supreme Court.  Pinholster, 131 S.Ct. at 1402, citing Harrington v. Richter, 131 S.Ct. 770, 786 (2011).  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision.  Richter, quoting Yarborough v. Alvarado, 124 S.Ct. 2140 (2004).

### E. Analysis

The Fifth Circuit has denied habeas relief in a case where a similar erroneous jury instruction was given in an attempted murder case but the facts did not indicate the mistake had a substantial effect or influence on the verdict.  The Court also denied relief on a related claim that counsel was ineffective for not objecting to the erroneous instruction.  Harris v. Warden, 152 F.3d 430 (5th Cir. 1998).   More relevant to this case, the Fifth Circuit reviewed similar claims in a case governed by the AEDPA and the currently applicable version of Section 2254(d).  Hongo v. Cain, 2001 WL 822446 (5th Cir. 2001) (unpublished).  Mr. Hongo's victim testified that he appeared at her front door armed with a pistol, shot at her twice, and hit her once in the head, which blinded her in one eye.  He later told police that he went to the home with the intention to shoot the victim's father and did not mean to shoot her.  He testified at trial that he was not carrying a pistol; it had been on a nearby table and accidentally discharged during a playful wrestling match.  See State v. Hongo, 625 So.2d 610 (La. App. 3rd Cir. 1993).

The attempted second-degree murder charge in Hongo contained the same deficiency as in this case.  The state appellate court found 2-1 that Hongo's attorney was ineffective and vacated the conviction.  The Supreme Court of Louisiana reversed and reinstated the

conviction because it found no prejudice in view of there being no evidence that would support a finding Hongo had merely the intent to inflict great bodily harm but not to kill. State v. Hongo, 706 So.2d 419 (La. 1997). The federal district court granted habeas relief, but the Fifth Circuit reversed because the district court did not afford appropriate deference under the then-new standards of Section 2254(d). It found the Supreme Court's characterization of the evidence was accurate and its application of the law to that evidence was not an unreasonable application of any clearly established Supreme Court decision.

The same result should be reached in this case. There was no version of the evidence under which a juror might convict Petitioner for merely intending to act with the intent to injure but not kill the victim. The victim's testimony, apparently accepted by the jury, was that Petitioner blasted the victim in the back with a 12-gauge shotgun at close range, said "You're going to die," and tried to reload and finish the job. Two appellate judges opined that the verdict was surely unattributable to the deficient instruction. The Louisiana courts apparently agreed on this point again during the post-conviction application, although they did not offer any reasoned explanation for their decisions.

Considering the deference that must be afforded the state court decisions, even unexplained summary decisions, habeas relief must be denied on these claims. The instruction was admittedly erroneous, and counsel was deficient in not objecting, but the state courts found based on a reasonable assessment of the record that any error was harmless and there was no prejudice stemming from counsel's mistake. Reasonable and fair-minded jurists

might debate the correctness of those decisions, but room for reasonable disagreement means that habeas relief must be denied under Section 2254(d).

**Batson Issues**

### A. **Batson** Violation Claim

Petitioner represents that his jury pool was representative of the parish population, but the prosecutor used her peremptory strikes so that there were no black male jurors seated. The final twelve jurors and an alternate included three black females, three white males, and seven white females.  Tr. 1092.  Petitioner contends that an accurate cross-section of the population should have resulted in five black jurors, and two of them should have been male. At the conclusion of jury selection, the trial judge asked, "Any Batson challenges by either one of you?"  Counsel for Petitioner answered, "No."  Tr. 628.

It was not until his post-conviction application that Petitioner argued that the prosecutor used peremptory strikes in violation of Batson v. Kentucky, 106 S.Ct. 1712 (1986).  The State argued that the claim was not properly raised in a post-conviction proceeding.  The state courts denied the claim summarily, as described above.

The Fifth Circuit has held that the rule of Batson does not enter the analysis of an equal protection claim unless a timely objection is made to the prosecutor's use of peremptory challenges.  Thomas v. Moore, 866 F.2d 803 (5th Cir. 1989).  The Court stated that a timely objection is a requisite to the claim, and it refused to address a Batson claim in a habeas petition that was not raised in the state court until after the trial was completed. More recently, the Ninth Circuit joined the Fifth and several other circuits that have

considered the issue and held that "an objection at trial is a prerequisite to a <u>Batson</u> challenge for purposes of habeas review." <u>Haney v. Adams</u>, 641 F.3d 1168, 1171 (9th Cir. 2011).  The Ninth Circuit also stated: "The Supreme Court has never allowed a <u>Batson</u> challenge to be raised on appeal or on collateral attack, if no objection was made during jury selection." <u>Id</u>. Relief is not available on this claim.

### B. Ineffective Assistance of Counsel

Petitioner makes a related claim that counsel was ineffective for not making a <u>Batson</u> challenge.  The state courts summarily rejected this claim on the merits.  To prevail, Petitioner must establish both that his counsel's performance fell below an objective standard of reasonableness and that, had counsel performed reasonably, there is a reasonable probability that the result in his case would have been different.  <u>Strickland</u>, 104 S.Ct. at 2064.

Petitioner's claim was adjudicated and denied on the merits by the state court, so 28 U.S.C. § 2254(d) directs that the question is not whether a federal court believes the state court's determination under the <u>Strickland</u> standard was incorrect but whether the determination was unreasonable, which is a substantially higher threshold. <u>Schriro v. Landrigan</u>, 127 S.Ct. 1933, 1939 ( 2007).  The <u>Strickland</u> standard is a general standard, so a state court has even more latitude to reasonably determine that a defendant has not satisfied it.  The federal court's review is thus "doubly deferential." <u>Knowles v. Mirzayance</u>,129 S.Ct. 1411, 1420 (2009).

"If this standard is difficult to meet, that is because it was meant to be." <u>Harrington</u> <u>v. Richter</u>, 131 S.Ct. 770, 786 (2011).  Section 2254(d) "stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings" and reaches only "extreme malfunctions" in the state criminal justice system.  <u>Id</u>.  Thus, "even a strong case for relief  does not mean the state court's contrary conclusion was unreasonable."  <u>Id</u>.

Petitioner alleges that some black male jurors were stricken without legitimate reason. The minutes indicate that the State used its peremptory strikes to strike two black male jurors (and one white male), while Petitioner struck eight white male jurors (and one black male). Petitioner identifies by name four potential jurors that he says were struck without legitimate reason and support a <u>Batson</u> claim.  Ricky Russell, Milton Houston, and Brian Champion were all struck for cause, not based on a peremptory challenge. Only Ricky Talley was subject to a peremptory strike, and one juror does not make a pattern under <u>Batson</u>. Petitioner does not articulate any other specific facts to support the <u>Batson</u> claim that he faults counsel for not pressing.

The "failure to present a particular argument or evidence is presumed to have been the result of a strategic choice."  <u>Taylor v. Maggio</u>, 727 F.2d 341, 347-48 (5th Cir. 1984). Habeas relief is unavailable if a petitioner fails to overcome the presumption that counsel made sound strategic decisions. <u>Del Toro v. Quarterman</u>, 498 F.3d 486, 491 (5th Cir. 2007). The Fifth Circuit has rejected a <u>Batson</u> habeas claim where it appeared counsel made the strategic decision not to attempt to meet the heavy burden that accompanies such challenges. <u>Wiley v. Puckett</u>, 969 F.2d 86, 102 (5th Cir. 1992).

The mere fact that the final jury panel did not precisely match the gender and racial characteristics of the census numbers for Bienville Parish does not render counsel ineffective for not raising a Batson challenge.  Perhaps grounds for a plausible Batson challenge could be discerned from the record if one had all the time in the world to sift through the hundreds of pages of voir dire, but that is not the court's obligation.  It is Petitioner who bears an extremely heavy burden of showing entitlement to relief under Strickland and, moreover, Section 2254(d).  He has not met that burden by presenting specific, documented facts that would give rise to such an overwhelmingly strong Batson claim that (1) counsel could be deemed ineffective for not raising it, (2) there is prejudice under Strickland, and (3) the state court's decision to deny the Strickland claim was not only wrong but an objectively unreasonable application of that precedent.  Petitioner's identification of one black male who was allegedly struck without a good reason is simply insufficient to meet that burden.

**Challenges for Cause**

Petitioner included under the heading of his Batson argument a separate contention that the trial court erred by denying three challenges for cause.  The State appears to have overlooked this claim in its state and federal briefs.  The first challenged juror was Jo Ann Yarnell, who the defense challenged based on her 25 years work as a police dispatcher with various departments and being married to a former policeman.  She was questioned about whether that would affect her ability to be impartial, and she said she did not think it would. The challenge for cause was denied.  Tr. 491-93.  Sammy Howell went to school with one of the ADAs who assisted on the case and had hired him for family legal work, but Howell

had never been to his home and did not see him on a regular basis.  Howell said he thought

he could be fair despite their familiarity.  After questioning, the court denied the challenge

for cause.  Tr. 545-60.  Bryan Toms had a similar relationship with the same ADA, but the

court was more concerned with Toms' desire to be at work rather than on a jury.  The court

questioned Toms and denied the defense challenge.  Id.

 The standard for determining when a venire member may be excluded for cause is

whether the prospective "juror's views would prevent or substantially impair the performance

of his duties as a juror in accordance with his instructions and his oath." Wainwright v. Witt,

105 S.Ct. 844, 852 (1985) (internal quotation marks and footnote omitted).  A state trial

court's refusal of a petitioner's challenge for cause is a factual finding entitled to a

presumption of correctness on habeas review.  Miniel v. Cockrell, 339 F.3d 331, 338-39 (5th

Cir. 2003), citing  Jones v. Butler, 864 F.2d 348, 362 (5th Cir.1988).

 Reasonable persons might disagree with whether a challenge for cause should have

been sustained with respect to these jurors, but each of them answered questions by the court

and counsel that gave ample grounds for the trial judge to rule as he did.  Furthermore, the

minutes show that Petitioner used peremptory challenges to strike each of these three

prospective jurors. Tr. 1092. Where a challenged juror is removed by the use of a peremptory

challenge after the denial of a challenge for cause, a petitioner is entitled to federal habeas

relief only if he demonstrates that the jury ultimately selected was not impartial.  Ross v.

Oklahoma, 108 S.Ct. 2273 (1988).  Defense counsel used peremptory strikes to remove these

jurors, and Petitioner has not alleged or shown that his final jury was not impartial, so this claim lacks habeas merit.  Dorsey v. Quarterman, 494 F.3d 527, 533 (5th Cir. 2007).

**Right to Testify**

The Supreme Court held in Rock v. Arkansas, 107 S.Ct. 2704 (1987) that every criminal defendant has the right to testify on his own behalf.  Petitioner argues that his right to testify was denied because counsel did not call him as a witness despite his stated desire to testify. He does not cite evidence of such a request.

Petitioner claims that counsel "expressly stated that he had one witness (Petitioner) he would be calling to the stand to testify."  This assertion is not supported by the record, which shows that the judge began voir dire by briefly describing the case, identifying the attorneys, and asking the parties to read their witness lists.  The judge said that the people named "may testify as witnesses in this case."  The State read its list, which it described as a may call list, and the judge asked if defense counsel had "any witnesses you wish to call out?"  Counsel stated, "I'd call the Defendant Charles Harris, Your Honor."  The judge then asked the potential jurors if they knew any of the persons who were potentially involved in the case.  Tr. 425-26. Counsel did not affirmatively state that Petitioner would testify, and Petitioner's assertion to the contrary is a misconstruction of the record.

Petitioner cites no evidence to support his contention that he told counsel he wanted to testify.  The record shows that, after the State rested, the judge told defense counsel that he would allow a few minutes if counsel wanted to talk to Petitioner and see if the defense wanted to put on evidence.  The following exchange then occurred:

Counsel for Defendant:  We've discussed it, your Honor.  (to the defendant) Do you want to tell the judge that you agree with what - - my recommendations so that he knows that you've been informed.

By the Defendant: I agree, your Honor.

The judge said he would nonetheless take a 15-minute break to let them talk before the jury returned, "and we'll decide what we're going to do."  Tr. 740.  When the jury returned, counsel stated: "Your Honor, the - - our client's testimony has been read -- read to the jury, so his testimony is in front of them, and they were able to read.  And, so, we just want to rest on the presumption of innocence."  Tr. 741.

Petitioner has pointed to absolutely no evidence to support his claim that trial counsel prevented him from exercising a desire to testify.  The record suggests that he was in complete agreement with the decision that he not take the stand and, instead, rely on the detailed statement he gave investigators.  Petitioner also argues that counsel should have moved for a mistrial when the prosecutor introduced his statement, but a statement by a party is plainly admissible so long as it was made voluntarily. L.C.E. 801(d)(2)(a); U.S. v. Meyer, 733 F.2d 362, 363 (5th Cir. 1984) ("Any and all statements of an accused person not excluded by the doctrine of confessions or the privilege against self-incrimination may be used against him as an admission and are not hearsay.").  Petitioner's efforts to invoke evidentiary rules regarding the use of prior inconsistent statements are misplaced.  The state court was completely reasonable in rejecting this claim.

Petitioner makes a related claim that counsel was ineffective for not calling him as a witness and, thereby, denying him his right to testify.  The state court was also reasonable

in rejecting this claim given the lack of supporting evidence and that counsel would have been wise to advise Petitioner not to testify, considering that he would be subject to impeachment with his bizarre and rambling statement to investigators.

**Photographs**

Petitioner complains that the prosecutor introduced irrelevant and gruesome photographs from the crime scene. State law matters such as the admission of evidence are generally not grounds for habeas relief. Estelle v. McGuire, 112 S.Ct. 475 (1991). Where graphic crime scene photos serve to illustrate and make more understandable an officer's testimony that describes the scene and its condition, the photos do not offend due process. Woods v. Johnson, 75 F.3d 1017, 1039 (5th Cir. 1996) (rejecting habeas claim based on eight photographs of the deceased's body, which helped understand the testimony and depicted the nature and extent of the injuries). The petitioner must show that the evidence was so unduly prejudicial that it rendered the trial fundamentally unfair. Anderson v. Quarterman, 204 Fed. Appx. 402, 407 (5th Cir. 2006) (rejecting habeas claim based on photos of bloody victims in a burned house).

Color copies of the photographs are in the record (Tr. 962-87). They show the gun, the trailer and car, small amounts of blood inside the trailer and car, and very minor wounds to Petitioner. They do not include any photos of the victim. These photos were plainly admissible to aid in the understanding of the testimony from the officers who investigated the crime scene and to help the jury better understand the setting for events described in the statement from Petitioner and the testimony of the victim. There is no basis for habeas relief

on this claim or the related claim that counsel was ineffective for not objecting to the admission of this evidence.  Any such objection would have been meritless, and counsel is not ineffective for failing to make meritless objections.  Johnson v. Cockrell, 306 F.3d 249-255 (5th Cir. 2002).

**Exculpatory Evidence**

Petitioner complains that the State failed to preserve and make available to him material and exculpatory evidence.  He complains that investigators should have obtained fingerprints from the shotgun, gun powder residue swabs from both men, timely photos of Petitioner's wounds, DNA tests on all blood found in the area, Petitioner's medical records, and the victim's toxicology report.  The state court summarily denied this claim.

Petitioner does not make a direct assertion that the State actually possessed potentially exculpatory evidence but did not produce it as required by Brady v. Maryland, 83 S.Ct. 1194 (1963).  Rather, he faults the State for not conducting a more extensive investigation, but he cites no Supreme Court decision that requires such perfection.  Deputy Price testified that he attempted to obtain fingerprints from the shotgun but could not lift any after the gun had been in the weather before being recovered.  In any event, Petitioner admitted that he used the shotgun to shoot the victim.  Gunpowder residue swabs would have accomplished nothing when Petitioner was the shooter in both versions of the events.  To the extent there was a toxicology report on the victim, Petitioner does not represent that it was not made available to the defense.  The other avenues of suggested investigation might have brought some

additional detail to the case, but there is no showing that any of these items might have tended to prove that Petitioner was not guilty.

Petitioner also accuses Deputy Price of giving false testimony.[1]  He contends that Price testified at a preliminary hearing that he "did not even attempt to dust the gun for fingerprints" because he did not see the need.   Petitioner claims that Price testified falsely when he later said at trial that he did dust the shotgun for prints but found none.  This claim is based solely on Price's alleged testimony at the preliminary hearing, but the language cited by Petitioner does not appear in the transcript of the hearing (Tr. 226-50), and Petitioner admits as much.  He contends that the transcript is not accurate, but he presents no evidence to support this bold claim.  The state court was reasonable to reject it.

## Prosecutor Misconduct

Petitioner contends that the prosecutor engaged in misconduct through improper argument and implied references to Petitioner's failure to testify.  Improper jury argument by the State does not provide a basis for habeas relief unless the argument "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  Darden v. Wainwright, 106 S.Ct. 2464, 2471 (1986).  The petitioner must also demonstrate prejudice by showing that the misconduct was so persistent and pronounced or that the evidence of

---

[1]To prove that the prosecution has denied him due process of law by allowing perjured testimony to go uncorrected, a petitioner must prove that (1) a witness for the state testified falsely; (2) the state knew the testimony was false; and (3) the testimony was material, meaning there is a reasonable likelihood the testimony could have affected the judgment of the jury.  Canales. v. Stephens, 765 F.3rd 551, 573 (5th Cir. 2014)

guilt was so insubstantial that the conviction would not have occurred but for the improper remarks.  Jones v. Butler, 864 F.2d 348, 356 (5th Cir. 1988); Turner v. Johnson, 106 F.3d 1178, 1188 n. 46 (5th Cir. 1997).

Petitioner suggests that the prosecutor went beyond the evidence by suggesting that Petitioner threw the shotgun on top of the shed when there was no specific testimony that he did so.  It was, however, a reasonable conclusion drawn from the evidence that Petitioner, the last person with possession of the shotgun before police arrived, had placed it on top of the shed where police found it. Petitioner contends that the prosecutor solicited false testimony from Deputy Price about dusting the shotgun for fingerprints, but it was shown above that this assertion has no factual support.  Petitioner faults counsel for injecting her personal opinion regarding the reliability of the statement Petitioner gave investigators, but counsel's arguments that Petitioner's story did not make any sense, was a fabrication made up with two weeks to prepare, and was not credible were within the scope of a reasonable argument.

The prosecutor stated in her closing argument that the "victim's testimony is uncontroverted."  Petitioner contends that this was an improper comment on his right to not testify at trial.  A prosecutor's comment on a defendant's failure to testify violates the Fifth Amendment right against self-incrimination. Griffin v. California, 85 S.Ct. 1229 (1965). But the remarks made by the prosecutor must be considered in context.  U.S. v. Delgado, 672 F.3d 320, 335 (5th Cir. 2012) (en banc).  The Fifth Amendment is violated if the prosecutor's manifest intent must have been to comment on the defendant's silence or if the character of

the remark was such that the jury would naturally and necessarily construe it as a comment on the defendant's silence.  Cotton v. Cockrell, 343 F.3d 746, 751 (5th Cir. 2003).  There is no manifest intent to comment on a defendant's failure to testify if there is another equally plausible explanation for the prosecutor's remarks.  The relevant question is not whether a jury possibly or even probably would construe the argument as a comment on the defendant's silence, but whether a jury would necessarily construe it as such.  Lee v. Michael, 2012 WL 1621369 (5th Cir. 2012).

The prosecutor in this case said nothing about Petitioner's failure to testify.  The victim being uncontroverted merely emphasized the strength of the State's case and commented on the failure of the defense, as opposed to the defendant, to counter or explain the State's evidence.  That kind of argument does not infringe the Fifth Amendment privilege.  See Montoya v. Collins, 955 F.2d 279, 287 (5th Cir. 1992); Lee v. Michael, supra.

A jury would not necessarily construe the argument as a comment on Petitioner's silence, so the argument did not run afoul of Griffin.  Petitioner has not cited any Supreme Court case that clearly establishes that a prosecutor may not characterize a witness's testimony as uncontroverted when it is.  Accordingly, Petitioner has not satisfied the burden of Section 2254(d) to obtain habeas relief on this claim.

**Enacting Clauses**

The Louisiana Constitution, Art. 3, Sec. 14 states: "The style of a law enacted by the legislature shall be, 'Be it enacted by the Legislature of Louisiana.'"  Petitioner argues that the state statutes for attempt and second-degree murder do not include "enacting clauses" in their language, and this deprived the state court of jurisdiction.  This claim is based on an argument that state law was violated, and the Supreme Court has "stated many times that federal habeas corpus relief does not lie for errors of state law."  <u>Swarthout v. Cooke</u>, 131 S.Ct. 859, 861 (2011).

Furthermore, enacting clauses typically appear at the beginning of the legislative act that formally enacts a statutory provision or provisions. The clause is not typically repeated in each of the actual statutes enacted by the act and that are later set forth in the Criminal Code.  That is consistent with the provision of Section 14 that: "It shall be unnecessary to repeat the enacting clause after the first section of an act."  Petitioner has not shown that the original legislative acts that adopted the second degree murder and attempt statutes at issue lacked the required language.

**Ineffective Assistance of Counsel**

### A. Claims Already Addressed

Petitioner asserts that counsel was ineffective under <u>Strickland</u> because she did not object to the jury instruction, did not call him as a witness, did not make a <u>Batson</u> challenge, and did not object to photos.  Those <u>Strickland</u> claims were discussed above and found to lack merit.  Petitioner makes similar claims that counsel was ineffective for not objecting to the State's lack of gathering and preservation of evidence, the prosecutor engaging in

misconduct, and the statutes at issue having deficiencies.  There are no demonstrated grounds for counsel to have made meritorious objections on these matters, which were found above to lack merit, so these <u>Strickland</u> claims also lack merit.

### B. Uncalled Witnesses

Petitioner raises a few other claims of ineffective assistance that were not touched on above.  He contends that counsel should have secured witnesses to give exculpatory testimony, and he claims that he was "not allowed" to call several material witnesses in regard to the victim being a "loan shark."  Petitioner's statement that was read to the jury included the loan shark assertion.  Tr. 117.  Assuming additional character evidence about the victim would be admissible, which is debatable, a petitioner has a heavy burden to show prejudice on a claim of an uncalled witness.  He "must name the witness, demonstrate that the witness was available to testify and would have done so, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable to a particular defense." <u>Day v. Quarterman</u>, 566 F.3rd 527, 538 (5th Cir. 2009).

Petitioner has not even named a potential exculpatory or character witness, let alone show by affidavit or otherwise that the other elements are met. This claim lacks merit.  <u>Cox v. Stephens</u>, 602 Fed. Appx. 141, 146 (5th Cir. 2015) ("Cox has failed, through affidavits or otherwise, to demonstrate that these witnesses would have testified ..."); <u>Gray v. Epps</u>, 616 F.3d 436, 443 (5th Cir. 2010) (petitioner failed to show uncalled witnesses were available to testify where affidavits did not contain statement to that effect); and <u>Evans v. Cockrell</u>,

285 F.3d 370, 377 (5th Cir. 2000) (reversing habeas relief when no affidavits were presented from the alleged witnesses).

### C. Other Trial Counsel Claims

Petitioner argues that counsel was ineffective because her cross-examinations were short and she did not thoroughly review all of the evidence from the one day of testimony in her closing argument.  Petitioner does not point out any questions that might have been asked or arguments that might have been made that could possibly have changed the result.  He also faults counsel for stipulating to the qualification of Dr. Simpkins as being a qualified physician and licensed in Louisiana before the State asked for any such qualification.  There is no hint that any objection to Dr. Simpkins' testimony would have been successful, so there is no prejudice here.

Petitioner faults trial counsel for not informing the new attorney hired after the verdict of the disparity of Petitioner's sentence.  Petitioner contends that John Jones was charged with the same offense and sentenced to only five years by the same judge, and Louis Mingo received only five years probation in a case where a victim was shot in the back.  The sentence in each case is based on all of the relevant facts, including the defendant's criminal and social history, the severity of the injury to the victim, and other factors.  The mere fact that another person committed a similar crime and received a lesser sentence does not require or even strongly counsel that Petitioner should receive that same sentence.  Petitioner has not demonstrated that trial counsel knew about these two other (alleged) cases but, even if he did, he was not constitutionally deficient for failing to pass along that information to the new

attorney after he was fired.  The likelihood that this information would have affected the sentence is too speculative to permit a finding of any prejudice.

### D. Appellate Counsel

Petitioner has asserted a number of substantive claims, with corresponding claims that trial counsel was ineffective for not raising appropriate objections or taking other action related to the substantive issues.  He has made a similar shotgun claim that appellate counsel was ineffective for not raising those same several claims addressed above.

On appeal, effective assistance of counsel does not mean counsel who will raise every non-frivolous ground of appeal available.  It means counsel who will perform in a reasonably effective manner.  Green v. Johnson, 160 F.3d 1029, 1043 (5th Cir. 1998).  When a petitioner claims that counsel omitted an issue that should have been argued, the petitioner must show that had the issue been raised there was a reasonable probability that he would have won on appeal.  Smith v. Robbins, 120 S.Ct. 746, 764 (2000); Moreno v. Dretke, 450 F.3d 158, 168 (5th Cir. 2006).  Petitioner has not demonstrated potential merit in any of the underlying claims, so appellate counsel was not ineffective for not cluttering the appellate brief with such meritless claims.

Accordingly,

**IT IS RECOMMENDED** that Petitioner's petition for writ of habeas corpus be denied.

### Objections

Page 30 of  32

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen (14) days from service of this report and recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Civ. P. 6(b).  A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.  Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file written objections to the proposed findings, conclusions and recommendation set forth above, within 14 days after being served with a copy, shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court.  See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

An appeal may not be taken to the court of appeals from a final order in a proceeding under 28 U.S.C. § 2254 unless a circuit justice, circuit judge, or district judge issues a certificate of appealability. 28 U.S.C. § 2253(c); F.R.A.P. 22(b).  Rule 11 of the Rules Governing Section 2254 Proceedings for the U.S. District Courts requires the district court to issue or deny a certificate of appealability when it enters a final order adverse to the applicant.  A certificate may issue only if the applicant has made a substantial showing of the denial of a constitutional right. Section 2253(c)(2). A party may, within fourteen (14) days from the date of this Report and Recommendation, file a memorandum that sets forth arguments on whether a certificate of appealability should issue.

THUS DONE AND SIGNED in Shreveport, Louisiana, this 14th day of August, 2015.

Mark L. Hornsby
U.S. Magistrate Judge